IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SCOTT LYNN GIBSON, | § | |
| TDCJ #699888, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-3405 |
| | § | |
| AHIA SHABAAZ, *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate Scott Lynn Gibson has filed suit under 42 U.S.C. § 1983, alleging violations of his civil rights in connection with the application of a prison policy.   He proceeds *pro se* and *in forma pauperis*.   At the Court's request, Gibson supplemented his complaint with a more definite statement of his claims.   After reviewing all of the pleadings as required under 28 U.S.C. § 1915A, the Court authorized service of process for Gail MacCartney, Douglas Appel, and a "John Doe" defendant responsible for the prison policy at issue.   MacCartney and Appel have filed a joint motion for summary judgment.   (Docket Entry No. 32).   Gibson has filed a response to the summary judgment motion.   (Docket Entry No. 33).   The defendants have filed a reply, to which Gibson has submitted more than one response.   (Docket Entry Nos. 35, 37, 38).   Gibson has also filed motions for discovery and for a default judgment.   (Docket Entry Nos. 34, 40).   Gibson's motions are denied for reasons set forth below.   After considering all of the pleadings, the summary judgment evidence, and the applicable law, the Court grants the defendants' motion for summary judgment and dismisses this case for reasons that follow.

## I.   **BACKGROUND**

Gibson is presently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (collectively, "TDCJ") at the Estelle Unit in Huntsville. Gibson filed this suit against MacCartney and Appel, among others, complaining that the defendants have denied him medical care, or delayed treatment, in violation of his constitutional rights.[1]   MacCartney is a registered nurse.   Appel is a licensed optometrist. Both MacCartney and Appel are employed by the University of Texas Medical Branch - Correctional Managed Care Division (collectively, "UTMB"), which is responsible for providing health care services to inmates incarcerated at certain TDCJ facilities.

Gibson was admitted to TDCJ in March of 1995.  The record reflects that Appel examined Gibson in August of 2002, and determined that he was nearsighted.  In October of 2002, Gibson received a pair of prescription eyeglasses to correct his vision deficiency. The eyeglasses were provided at no expense to Gibson.  A year later, in October of 2003, Gibson lost his prescription eyeglasses after he left them behind in the prison recreation yard, where he had taken them off to exercise.  In January of 2004, Gibson submitted a "sick call request" to the medical department in which he asked for a new pair of eyeglasses to replace the ones he had lost.  On January 6, 2004, a nurse informed Gibson that he was not eligible to receive a replacement pair of eyeglasses at public expense because, as a matter of prison

---

[1]   Gibson also sues Ahia Shabaaz and Judy L. Norris.  The Court did not authorize service of process for these defendants because, for reasons set forth briefly below, the pleadings do not establish a valid claim upon which relief can be granted against either of these supervisory officials.

policy, free replacement eyeglasses are provided where necessary only once every two years unless an exception applies.  Because he did not fit within an exception, Gibson was told that he would have to purchase his own eyeglasses if he desired a replacement pair before that time.

Under the policy at issue, identified as TDCJ Health Services Division Policy No. G-59.2 ("Policy No. G-59.2"), the State of Texas issues eyeglasses to offenders free of charge every two years to those with "uncorrected vision" of 20/50 or worse.  Exceptions to the two-year replacement policy exist where surgical conditions require replacement, where the eyeglasses are damaged through no fault of the offender, or in cases where there is a "documented loss" which merits replacement, such as where an offender loses or damages his eyeglasses while working at a prison job and the loss can be documented by a correctional officer or supervisor.  Inmates who do not qualify for a pair of replacement eyeglasses at public expense under an exception to Policy No. G-59.2 may purchase a pair from the medical department at any time for less than $20.00.

Gibson maintains that, by failing to promptly provide him with replacement eyeglasses at public expense, his ability to read and to draw was hampered.  Gibson alleges further that he suffered eye pain, irritation, and excruciating headaches because he was forced to wait until October of 2004 for a replacement pair of eyeglasses.  Gibson complains therefore that the prison policy limiting the provision of replacement prescription eyeglasses at public expense to every two years was applied to him in an unconstitutional manner.  In particular, Gibson contends that MacCartney and Appel applied this policy to him in

deliberate indifference to a serious medical need in violation of his rights under the Eighth Amendment to the United States Constitution.  Gibson seeks declaratory and injunctive relief.  In addition, Gibson requests $50,000 in compensatory damages for the pain and suffering that he reportedly endured.

MacCartney and Appel have filed a motion for summary judgment.  The defendants argue that Gibson has failed to fully exhaust his administrative remedies.  In addition, the defendants maintain that the policy is constitutional and that they are entitled to official as well as qualified immunity from Gibson's claims.  Gibson disagrees.  The parties' contentions are addressed below.

## II.   <u>STANDARD OF REVIEW</u>

The defendants' motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56, a court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  A movant's burden is to point out the absence of evidence supporting the nonmovant's case.  *See Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) (citing *Celotex*, 477 U.S. at 323; and *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996)).  To survive summary judgment, the nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each

4

element of the cause of action. *Id.* (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 349 (5th Cir. 2001)).

A material fact is one that "might affect the outcome of the suit under the governing law," and a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Genesis Ins. Co. v. Wausau Ins. Co.*, 343 F.3d 733, 735 (5th Cir. 2003) (citing *Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 456 (5th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)). "In determining whether summary judgment is appropriate, all the evidence introduced and all of the factual inferences from the evidence are viewed in a light most favorable to the party opposing the motion and all reasonable doubts about the facts should be resolved in favor of the nonmoving party." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). A reviewing court may not "step into the stead of the jury and weigh the evidence in a search for truth, but is instead to determine whether there exists a genuine issue for trial." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414 (5th Cir. 2003); *see also Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002) (stating that in deciding whether summary judgment was properly granted, "this court will not weigh the evidence or evaluate the credibility of witnesses.").

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998); *see also Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir.

5

1994) ("Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence."). Likewise, vague and conclusory assertions cannot defeat a properly supported motion for summary judgment. *See Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003). The Fifth Circuit has emphasized that the non-moving party does not demonstrate the existence of a genuine issue of fact (and does not thereby avoid summary judgment) by asserting "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations and internal quotation marks omitted); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (explaining that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden" at the summary judgment stage). In the absence of proof, a reviewing court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

The petitioner proceeds *pro se* in this case. Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys. *See Haines v. Kerner*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed.2d 652 (1972); *Bledsue v. Johnson*, 188 F.3d 250, 255 (5th Cir. 1999). Pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them. *See Haines*, 404 U.S. at 521; *see also United States v. Pena*, 122 F.3d 3, 4 (5th Cir. 1997) (citing

6

*Nerren v. Livingston Police Dept.*, 84 F.3d 469, 473 & n.16 (5th Cir. 1996)).  Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

### III.   DISCUSSION

#### A.   Exhaustion of Administrative Remedies

At the outset, the defendants argue that they are entitled to summary judgment because Gibson has not adequately exhausted his administrative remedies with respect to all of his claims.  This civil rights lawsuit is governed by the Prison Litigation Reform Act (the "PLRA"), which prohibits any action in federal court under 42 U.S.C. § 1983 concerning "prison conditions" until "such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  It is settled that, irrespective of the forms of relief sought, § 1997e(a) mandates exhaustion of *all* administrative procedures before an inmate can file a civil rights suit in federal court.  *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 152 L. Ed.2d 12 (2002); *Booth v. Churner*, 532 U.S. 731, 741, 121 S. Ct. 1819, 149 L. Ed.2d 958 (2001).  This requirement is based on the recognition that Congress enacted the exhaustion provision found in § 1997e(a) to allow prison officials the time and the opportunity to investigate and to address complaints internally.  *See Porter*, 534 U.S. at 525; *see also Prieser v. Rodriguez*, 411 U.S. 475, 492, 93 S. Ct. 1827, 36 L. Ed.2d 439 (1973) ("Since [the] internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems.").  By

7

requiring a prisoner to comply with grievance procedures, prison officials may be able to take corrective action, resolving the grievance without resort to federal court.  *See Porter*, 534 U.S. at 525.  Administrative review thus serves to filter out frivolous claims or, in the event of a federal case, allows prison officials the opportunity to develop an administrative record to facilitate adjudication of that case.  *See id.*

The Texas prison system has developed a two-part formal grievance process, both steps of which must be completed before a claim is considered exhausted.  *See Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).  The Step 1 grievance, which must be filed within fifteen days of the complained-of incident, is handled within the prisoner's facility.  *See Johnson*, 358 F.3d at 515. After an adverse decision at Step 1, the prisoner has ten days to file a Step 2 grievance, which is handled at the state level.  *See id.*; *see also Wendell v. Asher*, 162 F.3d 887, 891 (5th Cir. 1998) (outlining the TDCJ grievance process in more detail).  The Step 1 and Step 2 grievances filed by Gibson are reviewed below to determine whether he has exhausted his administrative remedies as required with regard to his claims.

Gibson filed a Step 1 grievance on June 7, 2004, which complains generally about having to wait to receive new prescription eyeglasses to replace the pair that he lost in October of 2003.  (Summary Judgment Motion, Exhibit F).  In this grievance Gibson alleges that, on June 4, 2004, an unidentified "nurse" in the Estelle Unit medical department denied him medical care or delayed treatment pursuant to a prison policy that provides a replacement pair of eyeglasses only once every two years.  According to Gibson the nurse

8

told him that, because he had lost his eyeglasses, he would have to wait two years to get another pair at public expense.  The prison official who responded to Gibson's Step 1 grievance contacted the medical department.  In answer to the investigator's query, MacCartney responded that Gibson would not have to wait two years from the date he requested a new pair of eyeglasses, but that he would be eligible for a replacement pair of eyeglasses under the prison policy in October 2004, which is two years from the date he received his initial pair in October 2002.  MacCartney further confirmed that Gibson's "Visual Acuity test" had been forwarded to the prison health care provider so that he could be referred to the optometrist.

Unsatisfied with the response to his Step 1 grievance, Gibson filed a Step 2 grievance on July 5, 2004.  Identifying MacCartney by name, the Step 2 grievance filed by Gibson asserts that he had already complained to MacCartney on unspecified occasions of the headaches and "eyeaches" he was experiencing as the result of having lost his eyeglasses. In that grievance Gibson objected that waiting to provide him with replacement eyeglasses until October of 2004 constituted a denial or delay of care for a "serious medical need."  In a response dated July 28, 2004, Gibson was told that he did not qualify for a free replacement pair of eyeglasses at public expense because he did not fit within the exception to the two-year rule found in Health Services Division Policy No. G-59.2, covering documented loss:

> Review of the Step 1 grievance, the response and available documentation concerning your allegation that you lost your glasses and that you are being denied a replacement pair of glasses, reflects an appropriate review at that

9

level.  The Health Services Policy is G-59.2, which indicates that eyeglasses will be replaced no earlier than every 24 months, if determined by an optometrist or ophthalmologist to be necessary.  **Documented loss** will be considered an exception.  Consultation with the optometry clinic reflects that documented loss does not include laying your glasses down on the recreation yard and then having them disappear.  In order to expedite resolution of medical complaints, you are encouraged to utilize the facilities medical complaints process by contacting the facility medical complaints coordinator before filing a grievance.  No action through the grievance mechanism is warranted.

(Summary Judgment Motion, Exhibit F) (emphasis in original).  The response to Gibson's Step 2 grievance addresses only his complaint about the policy, and does not address any specific allegation of wrongdoing on MacCartney or any other individual's part.

Based on the responses given to the claims raised in the Step 1 and Step 2 grievances, Gibson's allegations appear to have provided prison officials with fair notice and an opportunity to investigate his complaint about Policy No. G-59.2.  To the extent that Gibson's grievances complain about Policy No. G-59.2, the defendants do not allege or show that they were prejudiced in their ability to respond for lack of information.  The defendants therefore do not appear to dispute that Gibson's complaints about the policy and its alleged application to him are sufficiently exhausted.  Instead, MacCartney and Appel move for summary judgment on the claims brought against them as individual defendants on the grounds that Gibson failed to fully present his claims against them during the prison administrative grievance process.  Thus, MacCartney and Appel argue that Gibson's grievances lack the required level of detail about them as individuals because neither one is named specifically in connection with his complaints about Policy No. G-59.2.

10

Gibson concedes that the Step 1 grievance filed by him does not name any individual as responsible for application of Policy No. G-59.2. Gibson further concedes that, of the defendants named in his complaint, only MacCartney is identified in his Step 2 grievance as having any involvement in his claim. Gibson contends, however, that his grievances were sufficient to exhaust his claims against MacCartney and Appel because, although he did not name them individually, he referenced them by official title.

The Fifth Circuit has explained that, in deciding how much detail is required in a given case, a reviewing court "must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials 'time and opportunity to address complaints internally.'" *Johnson*, 385 F.3d at 516 (quoting *Porter*, 534 U.S. at 525). The grievance should be considered sufficient if it "gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Id.* at 516-17. Where an inmate claims that an individual prison official or employee has acted improperly, courts "can assume that the administrators responding to the grievance would want to know – and a prisoner could ordinarily be expected to provide – details regarding who was involved and when the incident occurred." *Johnson*, 385 F.3d at 517. The Fifth Circuit has acknowledged that "a grievance is not a summons and complaint that initiates adversarial litigation." *Id.* at 522. At the same time, "the grievance must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit, and for many types of problems this will often require, as a practical matter, that the prisoner's grievance identify individuals who are connected with the problem." *Id.*

11

Gibson's Step 1 grievance references an unidentified nurse who reportedly examined him on May 22, 2004, and again on June 4, 2004, and informed him that he was ineligible for replacement eyeglasses under Policy No. G-59.2. The Step 1 grievance also identifies the following individuals who Gibson claimed were responsible for denying or delaying medical treatment:

> I'm putting this office and the following people on notic [sic]: Head warden, Asst. warden, supervisor over medical and the optometrist [t]hat: (1) I'm in pain, (2) I'm being denied medical treatment for my serious medical need; (3) I'm being denied medical treatment because I lost my glasses, and (4) the policy that medical claims requires me to wait two years before I can get a new pair of glasses is unconstitutional and it is violating my 8th Amend. right by subjecting me to cruel and unusual punishment and for [denying] me medical treatment.

(Summary Judgment Motion, Exhibit F, Grievance #2004177837). Although there is no proof in the record that MacCartney was the nurse who treated Gibson on the days referenced, this grievance gives at least some notice about Gibson's complaint regarding Policy No. G-59.2 and its application by a nurse at the Estelle Unit. Likewise, although the information provided is equally vague about any possible involvement by Appel, the Step 1 grievance purports to put "the optometrist" on notice of a problem.

According to the Fifth Circuit, "a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like" can suffice. *Johnson*, 385 F.3d at 523. Because the grievance identifies a nurse and an optometrist at the Estelle Unit in connection with Gibson's claims about Policy No. G-59.2, a prison official could have reviewed the medical records and determined whether MacCartney and Appel

were, in fact, two of officials referenced by title in the grievance.  The defendants do not clearly argue or present any evidence showing that the ability of prison administrators to investigate Gibson's grievances was prejudiced for lack of information about the problem which has formed the basis of this suit.  Thus, the Court concludes that a genuine issue of material fact remains about whether the information provided was sufficient to exhaust administrative remedies.  Accordingly, the defendants are not entitled to summary judgment on this issue.  For reasons discussed more fully below, however, the Court concludes that Gibson's claims fail for other reasons.

### B.     Sovereign Immunity and Official Capacity Claims

The defendants argue that the Eleventh Amendment to the United States Constitution bars any claim for monetary relief against them in their official capacities.  The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  Federal court jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity that it embodies.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S. Ct. 114, 134 L. Ed.2d 252 (1996); *Vogt v. Board of Comm'rs, Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002).

Unless expressly waived, the Eleventh Amendment bars an action in federal court by, *inter alia*, a citizen of a state against his or her own state, including a state agency.  *See Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002).  As an

13

instrumentality of the state, TDCJ is immune from a suit for money damages under the Eleventh Amendment.  *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).  It is also settled that the Eleventh Amendment bars a recovery of money damages under § 1983 from TDCJ employees in their official capacity.  *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2001); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998), *cert. denied*, 528 U.S. 851 (1999).

In this case, Gibson sues all of the defendants for actions taken during the course of their employment with the State of Texas.  Because Gibson plainly seeks monetary damages in this case, the Eleventh Amendment bars his claims against all of the defendants listed in the complaint in their official capacity as state employees.  It follows that all of the defendants named in the pleadings are entitled to immunity under the Eleventh Amendment from Gibson's claims for money damages against them in their official capacity.[2]  The defendants' motion for summary judgment on this issue is granted.

### C.    Personal Involvement

MacCartney and Appel move for summary judgment on the grounds that neither one had the requisite level of personal involvement in the alleged constitutional violation.

-------

[2]    A narrow exception to Eleventh Amendment immunity exists for suits brought against individuals in their official capacity, as agents of the state or state entity, where the relief sought is injunctive in nature and prospective in effect. *See Aguilar*, 160 F.3d at 1054 (citing *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1980)). In this instance, Gibson is seeking injunctive relief.  However, Gibson's request for injunctive relief appears moot because he became eligible to receive a replacement pair of eyeglasses in October 2004, after he had already filed his complaint in this case.  To the extent that Gibson seeks declaratory relief and an injunction against the enforcement of an unconstitutional policy, his substantive claims are addressed further below.

Personal involvement is an essential element of a civil rights cause of action, meaning that there must be an affirmative link between the injury and the defendant's conduct. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v. Goode*, 423 U.S. 362, 371-72, 98 S. Ct. 598, 46 L. Ed.2d 561 (1976)). In order to successfully plead a cause of action in § 1983 cases, a civil rights plaintiff must "enunciate a set of facts that illustrate the defendants' participation in the wrong alleged." *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). Conclusory allegations or generalized assertions are not sufficient to state a claim; particular facts are required to specify the personal involvement of each defendant. *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992); *Fee v. Herndon*, 900 F.2d 804 (5th Cir.), *cert. denied*, 498 U.S. 908 (1990).

In this case, Gibson complains that MacCartney and Appel applied Health Services Division Policy No. G-59.2 to him with deliberate indifference to a serious medical need in violation of the Eighth Amendment. It is well established that a prison official's "deliberate indifference to serious medical needs of prisoners" can constitute "unnecessary and wanton infliction of pain" of the type proscribed by the Eighth Amendment and actionable under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed.2d 251 (1976). In that context, it is "obduracy and wantonness, not inadvertence or error in good faith," that characterizes the conduct prohibited by the Eighth Amendment, "whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L.

15

Ed.2d 251 (1986)).  "Thus, the prison official's state of mind must be examined to determine whether the undue hardship endured by the prisoner was a result of the prison official's deliberate indifference."  *Bradley*, 157 F.3d at 125 (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed.2d 271 (1991)).  To establish deliberate indifference under this standard, the prisoner must show that the defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed.  *See Farmer v. Brennan*, 511 U.S. 825, 827, 114 S. Ct. 1970, 128 L. Ed.2d 811 (1994); *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

Gibson complains that, by refusing to provide him with a free replacement pair of eyeglasses before October 2004, the defendants' application of Policy No. G-59.2 violated the Eighth Amendment by delaying needed medical treatment.  Policy No. G-59.2 provides for the replacement of "optical prostheses" or prescription eyeglasses free of charge to TDCJ inmates every two years, where necessary, unless an exception exists:

> Eyeglasses are provided on a prescription basis.  Eyeglasses will be replaced no earlier than every 24 months if determined by an optometrist or ophthalmologist to be necessary.  Documented loss, broken eyeglasses with no evidence of self-destruction, or surgical conditions will be considered exceptions.

(Summary Judgment Motion, Exhibit G).  The policy provides further that inmates who need "[o]ccupational lenses," such as for those who perform "welding" or similar tasks "will be evaluated on an individual basis."

Appel admits that he assisted a UTMB supervisor with revising the Policy No. G-59.2 in 1996.  (Summary Judgment Motion, Exhibit A).  However, there is no proof that Appel had any involvement in the policy's application to Gibson.  According to the optometry records, Appel's only interaction with Gibson was an examination performed on August 26, 2002, which resulted in Gibson's initial prescription for the corrective eyeglasses that he received in October 2002.  (Summary Judgment Motion, Exhibit C).

Gibson alleges that he sent numerous sick call requests to Appel, in which he reportedly complained about severe eye pain.  (Docket Entry No. 33, at 6-9).  However, the record contains no evidence to support the allegation that Gibson complained to Appel in person or otherwise after Gibson lost his eyeglasses and there is no showing that Appel had any knowledge of Gibson's condition.[3]

MacCartney, a registered nurse, insists in her affidavit that she "was not personally involved in the provision of nursing services related to the issue in this lawsuit."  (Summary Judgment Motion, Exhibit B).  MacCartney avers that she "did not personally receive any sick call requests from Mr. Gibson," and that she was not involved in formulating the policy. According to MacCartney, her personal involvement was limited to answering Gibson's Step 1 grievance:

---

[3]    The exhibit to which Gibson points in support of this allegation is the optometry record showing that Appel examined Gibson and prescribed eyeglasses in August of 2002.  This examination record, however, is not proof that Appel had any knowledge of Gibson's condition after he lost his eyeglasses in October of 2003.

> My involvement was limited to answering a grievance explaining that he had been administered a visual acuity test and [that] the results were forwarded to the provider for referral to the optometrist.  I further advised that he was eligible for free replacement eyeglasses in October, 2004.

Other than responding to the Step 1 grievance, none of the medical records, sick call requests, or I-60 forms submitted by Gibson bear MacCartney's name or signature.

Gibson alleges that MacCartney had knowledge of his condition through sick call requests that he submitted generally to the supervisor of the medical department. MacCartney describes herself in her affidavit as a registered nurse at the Estelle Unit.  There is no evidence that MacCartney occupies a supervisory position or that she was responsible for reviewing sick call requests addressed generally to the medical department.  Even if MacCartney were a supervisor, she cannot be held liable vicariously.  A supervisor may not be held liable for a civil rights violation under a theory of *respondeat superior* or vicarious liability.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978); *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003).  Supervisory officials can only be held liable if the plaintiff demonstrates either one of the following: (1) the supervisor's personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the deprivation.  *See Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987); *see also Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) ("[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor.").  Supervisory liability exists without overt personal participation in an offensive act only if supervisory

18

officials implement a policy "so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"  *Id.* at 304 (quoting *Granstaff v. City of Borger*, 767 F.2d 161, 169 (5th Cir. 1985)), *cert. denied*, 480 U.S. 916 (1987).

The only evidence in the record showing that MacCartney had any knowledge of Gibson's condition is her response to his Step 1 grievance, which is dated June 30, 2004. There are several other letters and I-60 Inmate Request Forms in the record that were submitted to the medical department by Gibson prior to that date to request an appointment with an optometrist.  However, neither Appel nor MacCartney's name appears on any of these documents.  (Summary Judgment Motion, Exhibit C).

Gibson has not established that MacCartney or Appel had the requisite personal involvement with the claims forming the basis for his complaint.  In that regard, Gibson presents nothing other than his own conclusory allegations that MacCartney or Appel had any connection to his request for replacement eyeglasses under the policy at issue.  Gibson's conclusory allegations are not sufficient to raise a genuine issue of material fact on the issue of personal involvement. *See Murphy*, 950 F.2d at 292.  Therefore, the defendants' summary judgment motion on this issue is granted, and the claims against MacCartney and Appel individually are dismissed.

### D.    Qualified Immunity

MacCartney and Appel argue further that, based on the allegations made by Gibson, they are entitled to qualified immunity from his claims against them.  It is generally true that

19

public officials acting within the scope of their authority are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815-19, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982). Officials sued in their individual capacities are protected by qualified immunity unless the alleged act violates a constitutional right that was clearly established at the time. *Sanchez v. Swyden*, 139 F.3d 464, 466-67 (5th Cir. 1998).

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 153 L. Ed.2d 666 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001)). If a violation could be made out on a favorable view of the parties' submissions, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. If so, then the Court must assess whether the defendant's conduct was objectively reasonable under the circumstances in light of clearly established law. *See Thompson v. Upshur County, Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998)).

To avoid summary judgment, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law *and facts available to them*." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994) (emphasis added). "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council – President Gov't*, 279 F.3d 273, 284 (5th

Cir. 2002) (quoting *Thompson v. Upshur Cty.,* 245 F.3d 447, 456 (5th Cir. 2001)).  "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)).

MacCartney and Appel argue that they are entitled to qualified immunity because Gibson cannot demonstrate that either one of them acted with deliberate indifference.  Even assuming that a constitutional violation occurred, MacCartney and Appel argue further that neither one acted in an objectively unreasonable manner under the circumstances.  In view of the fact that Gibson has failed to establish that either MacCartney or Appel had the requisite personal involvement with the incidents forming the basis of his complaint, it follows that Gibson has failed to show that either defendant acted in an objectively unreasonable manner based on the facts known to them at the time.  *See Lampkin*, 7 F.3d at 435.  In that regard, the record does not demonstrate that MacCartney or Appeal knew of, but disregarded, facts from which an inference of an excessive risk to Gibson's health or safety could be drawn, and that they actually drew an inference that such potential for harm existed.  *See Farmer*, 511 U.S. at 827.[4]  Gibson has failed to raise a genuine issue of material fact on whether MacCartney and Appel are entitled to qualified immunity.  Therefore, the defendants' motion for summary judgment on this issue is granted.

---

[4]    This inquiry necessarily overlaps with the merits analysis of whether either individual defendant acted with deliberate indifference to a serious medical need.

### E.     Claims About Policy No. G-59.2

Gibson has sued an unamed "policy maker" in connection with Policy No. G-59.2.

He claims that the policy of providing replacement eyeglasses at public expense where the

documented loss exception is not satisfied is "unconstitutional."[5]  The defendants maintain

that Policy No. G-59.2 is not unconstitutional and was not applied to Gibson in violation of

his constitutional rights.

In support of the summary judgment motion, the defendants present an affidavit from

Appel, a licenced optometrist who has provided services to TDCJ inmates since 1985, in

which he details the basis for Policy No. G-59.2.  (Summary Judgment Motion, Exhibit A).

Appel explains that he and a supervisor revised Policy No. G-59.2 in 1996.  The policy was

designed to provide eyeglasses at public expense for inmates whose vision deficiency is

20/50 or worse.  Appel notes that this is the same criteria used for requiring corrective lenses

under the Texas Department of Public Safety regulations governing driver's licenses.  The

provision found in Policy No. G-59.2 that limits replacement eyeglasses at public expense

to every two years is patterned after the federal Health Care Financing Administration

("HCFA") regulations for Texas Medicaid recipients.  The HCFA policy provides that Texas

Medicaid recipients are only eligible for state-funded replacement of eyeglasses every two

years unless the individual's eyes "undergo a change in visual acuity of .5 diopters or more,

or the eyewear is lost or destroyed."  Appel states that he and his supervisor believed that it

---

[5]        Gibson does not particularize this claim.

was "reasonable" for the State of Texas to provide eyeglasses free of charge to offenders housed incarcerated within TDCJ if their uncorrected vision was poor enough for them to need corrective lenses in order to obtain a driver's license, and that it was likewise "reasonable to replace eyeglasses at public expense on the two-year schedule set forth for Texas Medicaid recipients unless the offender could establish documented loss of the eyeglasses."

Appel points out that Policy No. G-59.2 applies only to the replacement of prescription eyeglasses at public expense. "Offenders who desire replacement of their eyeglasses more frequently than two years, or who do not fit into any of the exceptions provided in the policy, are free to purchase replacement eyeglasses [on their own.]" Appel advises that the present cost for replacement eyeglasses in TDCJ is $19.33. According to Policy No. G-59.2, offenders who are not eligible for a free replacement pair of eyeglasses "are to be told by their health care provider that they may purchase eyeglasses if they desire." Appel explains that TDCJ offenders who purchase replacement eyeglasses are guaranteed to receive them even if they are indigent and without sufficient funds in their inmate trust fund accounts:

> The offender . . . must complete the appropriate paperwork to request the replacement eyeglasses and authorize a deduction from their Inmate Trust Account. Once an offender requests the replacement, agrees to pay and authorizes the purchase, the eyeglasses are ordered and made. Money is only deducted from the offender's Trust Account after the eyeglasses have been delivered to the offender at his or her unit of assignment. If the offender lacks sufficient funds in his Trust Account, [Appel's] understanding is that a hold will be placed on the account and the amount will be deducted from funds as

they become available.  Therefore, even if an offender knows that he lacks funds, he may still request the eyeglasses and authorize future payment.

Appel notes that, had Gibson completed the required written request, the eyeglasses would have been made and dispensed.

The medical records in this case show that Gibson received his first pair of prescription eyeglasses in October of 2002, meaning that he would be eligible for a replacement pair two years later in October of 2004, unless he met one of the exceptions found in Policy No. G-59.2.  When Gibson first reported to the medical department that his eyeglasses were missing on January 6, 2004, the nurse determined that he did not fit within the exception for documented loss found in Policy No. G-59.2 and informed Gibson that he would have to "pay for [his] glasses." (Summary Judgment Motion, Exhibit C).  Gibson was examined in the medical department again on July 30, 2004, where a physician's assistant further advised him regarding "his need to purchase another pair of glasses."  It is undisputed, however, that Gibson did not complete the required written request for replacement eyeglasses.

In response to the summary judgment motion, Gibson claims that he mistakenly believed he had to purchase eyeglasses through a "free-world clinic" and that the medical department did not provide adequate information about how to purchase a replacement pair of eyeglasses under the policy.  Although Gibson complains that he did not know he could purchase eyeglasses from the medical department, Gibson tacitly concedes that he did not request this information or ask for clarification in spite of having opportunities to do so.

24

More importantly, to the extent that Gibson complains he was given insufficient information, he does not allege and the record does not otherwise demonstrate that this failure was intentional.  The Fifth Circuit has stated that the deliberate indifference standard is an "extremely high" one to meet.  *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A showing of "mere negligence in failing to supply medical treatment" will not suffice.  *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001), *cert. denied*, 534 U.S. 1136 (2002); *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.) ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."), *cert. denied sub nom. Stewart v. Knutson*, 528 U.S. 906 (1999).  Instead, the plaintiff must demonstrate that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (citations omitted).  It therefore is clear that Policy No. G-59.2 is not unreasonable or "unconstitutional" under the Eighth Amendment or any theory of which this Court can conceive.

To the extend Gibson contends the policy was unconstitutionally applied under the Eighth Amendment, Gibson's claim fails.  In this case, any allegation by Gibson that he was denied care is refuted by the medical records, which show that he was seen by the medical department.  *See Varnardo v. Lynaugh*, 920 F.2d 320 (5th Cir. 1991). Gibson does not dispute that he was provided access to treatment.  Rather, Gibson argues that he suffered excruciating headache and eye pain as a result of decisions which delayed treatment in the

form of a replacement pair of prescription eyeglasses at public expense.  To the extent that Gibson disagrees with the level of treatment that he received, the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment.  *See Stewart*, 174 F.3d at 535; *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977).  Even if a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not a constitutional violation.  *See Harris*, 198 F.3d at 159 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).  It is well established that only "deliberate indifference" implicates a constitutional violation in this context.  *See Wilson*, 501 U.S. at 297; *see also Farmer*, 511 U.S. at 835.  Thus, allegations of inadvertent failure to provide adequate medical care, or of a negligent diagnosis, simply fail to establish the requisite culpable state of mind.  *See Wilson*, 501 U.S. at 297; *Stewart*, 174 F.3d at 534; *see also Domino*, 239 F.3d at 756 (noting that "an incorrect diagnosis does not amount to deliberate indifference").

In addition, Gibson fails to establish that he suffered the requisite level of harm as the result of any delay in providing treatment.  In cases such as this one, arising from allegations of delayed medical attention rather than a clear denial of medical treatment, a plaintiff must demonstrate that he suffered substantial harm resulting from the delay in order to state a claim under the Eighth Amendment.  *See Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).  "Delays that courts have found to violate the Eighth Amendment have frequently

involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citing *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 & n.21 (11th Cir. 1994) (collecting cases)). *See, e.g., Hutchens v. State of Alabama*, 466 F.2d 507, 508 (5th Cir. 1972) (alleging daily lack of medical attention and medication which produced intolerable pain and which further shortened the prisoner's life expectancy from cancer); *Hughes v. Noble*, 295 F.2d 495, 496 (5th Cir. 1961) (per curiam) (following an automobile accident, pretrial detainee jailed for thirteen hours with broken neck and forced to endure "severe pain" despite "repeated requests for medical attention").

In an affidavit attached to the defendants' summary judgment motion, Appel notes that Gibson is nearsighted with uncorrected distance vision of 20/200. (Summary Judgment Motion, Exhibit A). Appel explains that this means Gibson could see figures but could not "read at a distance." Appel adds further that, while this means that Gibson would not likely be able to safely drive a car, he would not otherwise pose a threat to himself or others without eyeglasses. Appel also notes that, because Gibson is nearsighted, he would not have eye pain or headaches from reading. Appel advises, moreover, that "failure to wear eyeglasses, even for an extended period, will not cause a person's vision to worsen or otherwise injure the health of the eye."

While Gibson maintains that he suffered from severe headaches and eye pain, he does not allege or show that his condition was life threatening or that he was incapacitated for lack of prescription eyeglasses. In that respect, Gibson was not prescribed eyeglasses to correct

nearsightedness until October of 2002.  Gibson lost his prescription eyeglasses in October

of 2003, after he took them off to exercise in the recreation yard and then left them behind.

Although he is nearsighted, Gibson reports that he had difficulty reading and drawing

without corrective eyeglasses.  Gibson alleges further that, without eyeglasses, his eyes were

irritated and that he suffered excruciating headaches.  Gibson also alleges that his vision has

worsened as a result of the delay.  The medical records presented in this case contain no

proof that Gibson's eyesight has worsened and there is only sparse evidence that he

complained to the medical department of headache or eye pain.

Gibson's medical records show that he was treated in the clinic for symptoms

associated with hypoglycemia on December 12, 2003, which is three months after he

reportedly lost his eyeglasses.  (Summary Judgement Motion, Exhibit C).  On that occasion,

Gibson complained of feeling dizzy, "shaky," and "hungry," but he did not mention losing

his eyeglasses.  Likewise, Gibson did not complain of any headache or eye pain.

The clinic notes show that it was not until January 6, 2004, that Gibson sent a sick call

request to report his "lost eyeglasses" and to request an appointment with an eye doctor.  The

nurse who examined Gibson noted that he wanted to see an eye doctor but that he would

have to have a "V.A." or visual acuity test first.  The nurse also notified Gibson that he

would have to pay for his replacement eyeglasses.  There is no notation in the chart reflecting

that Gibson complained of headache or eye pain at that time.

Gibson sent a letter addressed generally to the "medical" department on March 25,

2004, asking whether an appointment had been scheduled for him to see an eye doctor so that

he could get new eyeglasses.  The letter does not mention headaches, eye pain, or any other problem associated with lack of prescription eyeglasses.

On May 20, 2004, Gibson sent a sick call request that was addressed generally to the medical department.  Gibson again requested an appointment with an optometrist for the purpose of getting new eyeglasses.  In this request, Gibson mentions that his eyes were irritated and that he was experiencing "excruiating [sic] headaches/eyeaches" without eyeglasses.  A short while later Gibson filed his Step 1 grievance on June 7, 2004, requesting new eyeglasses and complaining that he was "in pain" because of "excruiating [sic] headaches/eyeaches."

On June 25, 2004, Gibson sent an I-60 Inmate Request Form asking if he had been scheduled to see an optometrist.  This request does not complain about eye pain or headaches.  The response, dated the same day, indicated that an appointment had not yet been scheduled for him.

On July 28, 2004, Gibson sent a sick call request addressed generally to the "Optometrist or Supervisor" of the Medical Department asking for an optometry appointment.  In that letter, Gibson complained that his eyes had been causing him pain, but he does not mention suffering from headaches.  Gibson was examined by a physician's assistant shortly thereafter on July 30, 2004, where he complained of recurrent stinging and burning in his eyes, but made no reference to suffering from excruciating headaches of the type referenced in his pleadings.  The physician's assistant diagnosed "mild allergic conjunctivitis" and "myopia."  He prescribed drops to treat Gibson's "eye allergies."

Poor vision that requires corrective lenses may, under certain circumstances, constitute a serious medical condition.  For example, one court has held that a serious medical condition exists where visual deficiencies are such that deprivation of corrective eyeglasses could cause the prisoner to fall or walk into objects and the prisoner has, in fact, experienced such occurrences and has suffered injuries as a consequence.  *See Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).  Another court has found that an inmate who is "legally blind," and who required eyeglasses to work or to function in the general prison population, had a serious medical condition.  *See Benter v. Peck*, 825 F. Supp. 1411, 1416, 17 (S.D. Iowa 1993).  Gibson does not allege or show that his circumstances rise to the level of seriousness shown in these cases.  Although Gibson alleges that his headaches were severe, he has not demonstrated that his condition was life-threatening or that the delay exacerbated his medical problems.  *See Bass v. Sullivan*, 550 F.2d 229 (5th Cir.) (rejecting the argument that "tardy" decisions resulted in the amputation of a prisoner's gangrenous legs), *cert. denied*, 434 U.S. 864 (1977); *see also Davidson v. Scully*, 155 F. Supp.2d 77, 89 (S.D.N.Y.2001) (finding blurry vision, headaches, and tearing not conditions that produce degeneration or extreme pain and not sufficiently serious condition under Eighth Amendment).

Based on this record, Gibson fails to show that Policy No. G-59.2 is unconstitutional on its face or that it was implemented with reckless disregard of the risk that he would suffer serious harm to his health.  In that respect, Gibson fails to controvert Appel's affidavit explaining that the policy governing two-year replacements at public expense is reasonably

30

based on the same one applicable to Texas Medicaid recipients.  Moreover, Gibson has not

shown that he suffered substantial harm because of a delay in treatment for a sufficiently

serious medical condition.  Because Gibson has not raised a genuine issue of material fact

on whether the policy was unreasonable, or whether it was applied to him in deliberate

indifference to a serious medical condition, he has failed to demonstrate a constitutional

violation in connection with the policy or its application.  For this reason, the defendants are

entitled to summary judgment.


IV.   **PLAINTIFF'S MOTIONS**

   A.   **Discovery Motion**

   In response to the defendants' summary judgment motion, Gibson has filed a motion

for discovery.  The Court construes the motion as one filed under Rule 56(f) of the Federal

Rules of Civil Procedure.  Motions for a continuance under Rule 56(f) are "generally

favored, and should be liberally granted."  *Stearns Airport Equip. Co. v. FMC Corp.*, 170

F.3d 518, 534 (5th Cir. 1999) (citing *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d

1257, 1267 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992)).  However, to justify a

continuance, the Rule 56(f) motion must demonstrate (1) why the movant needs additional

discovery, and (2) how the additional discovery will likely create a genuine issue of material

fact.  *See Stearns Airport Equip.*, 170 F.3d at 534-35 (citing *Krim v. BancTexas Group, Inc.*,

989 F.2d 1435, 1442 (5th Cir. 1993)).  In that regard, the movant "must be able to

demonstrate how postponement and additional discovery will allow him to defeat summary

judgment; it is not enough to 'rely on vague assertions that discovery will produce needed, but unspecified, facts.'" *Stearns Airport Equip.*, 170 F.3d at 535 (quoting *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990) (citation omitted)).

Gibson requests certain information and records concerning the existence of an alleged prison policy allowing inmates to purchase prescription eyeglasses from "the commissary." The defendants have filed a response to Gibson's discovery motion, which clarifies that replacement eyeglasses are not available at the commissary, but that arrangements to purchase eyeglasses are instead made through the medical department as outlined in Appel's affidavit. (Summary Judgment Motion, Exhibit A). Gibson, who has filed a substantial response to the defendants' summary judgment motion, does not provide any information or argument about how the requested discovery will raise a genuine issue of material fact. Thus, he presents only conclusory assertions in support of his claim that discovery is needed. Because Gibson has not established how the information he seeks will create a genuine issue of material fact, his motion for leave to conduct discovery is denied.

**B.    Motion for Default Judgment**

The complaint in this case names Ahia Shabaaz, Judy Norris, Douglas Appel, and Gail MacCartney. The complaint also lists "John Doe" as a defendant responsible for establishing and enforcing Policy No. G-59.2. After reviewing the pleadings, the Court authorized service of process and requested an answer from Appel and MacCartney, as well as a "John Doe" policy maker at UTMB. To date, only Appel and MacCartney have filed an answer. Gibson has filed a motion for a default judgment, arguing that there has been no

response filed on behalf of a "John Doe" policy maker.  In response to Gibson's motion for a default judgment, the defendants contend that the answer filed by Appel, who admittedly assisted in revising the policy at issue, is sufficient to resolve the merits of this case.

Courts in this circuit follow a policy that favors resolving cases on the merits and against the use of default judgments.  *See, e.g., Lindsey v. Prive Corp.*, 161 F.3d 886, 892-93 (5th Cir. 1998); *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989).  Thus, it is well established that "[a] party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default." *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996) (citing *Mason v. Lister*, 562 F.2d 343, 345 (5th Cir. 1977)).  Because it appears that Appel has filed a response as the "policy maker" in this case, there has been no default.  In that regard, the answer and dispositive motion filed jointly by Appel and MacCartney have adequately resolved the merits of Gibson's claim concerning Policy No. G-59.2.  Accordingly, the Court agrees that Gibson's motion for a default judgment is without merit.

## V.   REMAINING DEFENDANTS

As noted above, the complaint filed by Gibson also names Ahia Shabaaz and Judy Norris as defendants in this case, but the Court did not authorize service of process for these individuals.  Shabaaz is Director of Clinical Services for the TDCJ Health Services Division and Norris allegedly serves as Director of "Utilization Management."  According to the pleadings, Gibson's complaint against Shabaaz and Norris is that these supervisory officials

33

allowed Appel and MacCartney to enforce Policy No. G-59.2 in violation of his constitutional rights.

At most, Shabaaz and Norris are named in the complaint in their capacity as supervisory officials. A review of the grievances submitted by Gibson in this case shows that he has not exhausted his administrative remedies with respect to any claim against Shabaaz or Norris. Moreover, it is clear, on the merits, that Gibson has no valid civil rights claim against Shabaaz or Norris for actions taken in their supervisory role. *See Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987); *see also Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) ("[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor.").

In this instance, the pleadings filed by Gibson fail to allege or otherwise articulate facts showing that Shabaaz or Norris had any direct personal involvement with the incidents forming the basis of his complaint, or that there was any causal connection between these defendants and the alleged wrongful conduct. His conclusory allegations are insufficient to state a claim against these defendants. *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992); *Fee v. Herndon*, 900 F.2d 804 (5th Cir.), *cert. denied*, 498 U.S. 908 (1990). Likewise, Gibson has failed for reasons outlined above to establish that his constitutional rights were violated as a result of a policy. Accordingly, Gibson's complaint against Shabaaz and Norris fails to state a claim upon which relief can be granted. Gibson's claims against Shabaaz and Norris are therefore dismissed under 28 U.S.C. § 1915(e)(2)(B).

## VI.   CONCLUSION AND ORDER

For all of the foregoing reasons, the Court **ORDERS** as follows:

1.     The defendants' motion for summary judgment (Docket Entry No. 32) is **GRANTED**.

2.     The plaintiff's motion for discovery (Docket Entry No. 34) and motion for default judgment (Docket Entry No. 40) are **DENIED**.

3.     This case is **DISMISSED** with prejudice.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Houston, Texas, on **June 23, 2005**.

Nancy F. Atlas
United States District Judge